Filed 4/2/14 Unmodfied opinion attached

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

**THE PEOPLE,**

      **Plaintiff and Respondent,**      **A136371**

      **v.**      **(Contra Costa County
Super. Ct. No. 51105162)**

**JESUS CANELA,**

      **Defendant and Appellant.**      **ORDER MODIFYING OPINION
[CHANGE IN JUDGMENT]**
_____/

THE COURT:

It is ordered that the opinion filed herein on March 11, 2014, be modified as follows:

1.  On page 21, part V, delete the entire paragraph, beginning "When the court" and insert the following paragraphs:

When the court sentenced appellant, it gave him credit for 956 days of presentence credit, comprised of 831 custody credits and 125 conduct credits. Appellant's final claim is he is entitled to two additional days of custody credit (833 days) and one less day of conduct credit (124 days) for a total of 957 days (§§ 2900.5, subd. (a), 2933.1, subd. (c), 667.5, subd. (c)). Appellant is correct.

Appellant was arrested on May 8, 2010, and sentenced on August 17, 2012. The date of arrest (*People v. Lopez* (1992) 11 Cal.App.4th 1115, 1124) and the date of sentencing (*People v. Smith* (1989) 211 Cal.App.3d 523, 525-526) must be included in the calculation of presentence custody. Calculated from his arrest until the date of sentencing, appellant's period of actual presentence custody totals 833 days, not the 831 days the trial court awarded. His presentence conduct credits, calculated at 15 percent of 833, are 124 days. (*People v. Ramos* (1996) 50 Cal.App.4th 810, 815-817.) Accordingly, the abstract

1

of judgment for appellant must be corrected to reflect a total of 957 total days of presentence custody credits, consisting of 833 days of actual custody plus 124 days of conduct credits pursuant to section 2933.1.

2. On page 21, delete the first sentence under the heading DISPOSITION, beginning "The judgment is" and insert the following sentence:

The judgment is modified to: (1) impose a theft fine of $10 (Pen. Code, § 1202.5, subd. (a)) and penalty assessments on that fine in the amount of $26; and (2) award appellant 957 days of presentence custody credits, consisting of 833 days of actual custody plus 124 days of conduct credits pursuant to Penal Code section 2933.1.

This modification changes the judgment.

The petition for rehearing is denied.

Dated: _____          _____, P.J.

2

Superior Court of the County of Contra Costa, No. 51105162, Leslie Landau, Judge.

Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Juliet B. Haley, Deputy Attorney General, for Plaintiff and Respondent.

A136371

Filed 3/11/14 (Unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


THE PEOPLE,

      Plaintiff and Respondent,                   A136371

      v.                                  **(Contra Costa County
                                            Super. Ct. No. 51105162)**

JESUS CANELA,

      Defendant and Appellant.

_____/


A jury convicted appellant Jesus Canela of several crimes, including second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c) (Count 1))[1] and evading a peace officer and driving in the direction opposite to traffic (Veh. Code, § 2800.4 (Count 4)). The jury found true gang and great bodily injury sentencing enhancements (§§ 186.22, subd. (b), 12022.7, subd. (a)) and the trial court sentenced appellant to state prison.

On appeal, appellant contends: (1) the prosecutor used peremptory challenges to exclude African-Americans from the jury panel and the court erroneously denied his *Batson/Wheeler*[2] motion; (2) there was insufficient evidence to support the true findings on the gang enhancement (§ 186.22, subd. (b)) and the great bodily injury enhancement

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, and V.

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

[2] *Batson v. Kentucky* (1986) 476 U.S. 79, 95-96 (*Batson*), *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*), disapproved on another ground in *Johnson v. California* (2005) 545 U.S. 162, 166-168.

1

(§ 12022.7, subd. (a)); (3) the court erred by imposing a $41 "theft offense fine" (theft fine) pursuant to section 1202.5; and (4) he is entitled to one additional day of presentence credit.

In the published portion of the opinion, we conclude appellant personally inflicted great bodily injury "in the commission" of Count 4 within the meaning of section 12022.7, subdivision (a). In the unpublished portion of the opinion, we conclude the court did not err by denying appellant's *Batson/Wheeler* motion and substantial evidence supports the section 186.22 gang enhancement. We also conclude the amount of the section 1202.5 theft fine must be reduced and appellant is entitled to 957 days of presentence credit.

We modify the judgment to: (1) impose a theft fine of $10 and penalty assessments on that fine in the amount of $26 pursuant to section 1202.5; and (2) award appellant 957 days of presentence credit. We direct the trial court to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We provide an overview of the facts here. We provide additional factual and procedural details as germane to the discussion of appellant's specific claims.

*The Crimes*

On May 8, 2010, I.B. walked by a parked Buick LaSabre. A man — later identified as appellant — was in the driver's seat. Another man — later identified as Francisco Chavez — was in the passenger seat. Chavez asked to borrow I.B.'s phone; I.B. handed the phone to Chavez, who made a call while I.B. walked around to the driver's side of the car. When Chavez finished the call, I.B. asked Chavez to return the phone. Chavez asked to use the phone again and I.B. did not respond.

Chavez pulled out a gun, leaned across appellant, and pointed it at I.B. Chavez told I.B. to give him "whatever" I.B. had. I.B. ran. Appellant got out of the car and chased him, catching him, and grabbing I.B.'s sweatshirt. I.B. pulled himself free of the

2

sweatshirt, leaving it in appellant's hands, and fled. Without saying anything, appellant returned to his car and drove away. I.B. called the police from a nearby store.

Shortly thereafter, Richmond Police Officer Byron Macrenato responded to a call from dispatch that a person had been robbed at gunpoint and that the robbers' vehicle was a blue, older-model Buick occupied by two Hispanic men in their 20's wearing dark-colored tops, and hats, and armed with a semiautomatic handgun. Officer Macrenato saw a 90's "blue-purplish Buick occupied by two Hispanic males wearing black shirts and black hats." The car was preparing to turn left. Officer Macrenato made eye contact with appellant, who looked in Officer Macrenato's direction and continued northbound instead of turning. Officer Macrenato followed the vehicle without activating his lights and sirens and called for backup.

Shortly thereafter, two other Richmond police officers, Phil Sanchez and Ian Reid, arrived in separate patrol cars with their lights and sirens activated. At that point, appellant "immediately took off at a high rate of speed," and the three officers followed with their lights and sirens activated. Appellant drove "at least 40 miles an hour" in a 25 mile per hour zone. Appellant ran a stop sign, turned left, and ran three red lights. Then he made a left turn through a red light without slowing down and hit pedestrian M. Broadway, who was pushing a shopping cart. The force of the collision knocked Broadway about 25 feet into a parking lot, and sent some of his possessions flying. The impact was so strong that Broadway "went airborne" like a rag doll tossed into the air. Broadway — who was lapsing in and out of consciousness, and who appeared to have severe head and leg injuries — was taken to the hospital, where he underwent surgery for a spinal fracture.

Appellant's car skidded. The rear wheels landed on the sidewalk and the rear windshield shattered. Appellant drove back onto the street and slowed down; Chavez jumped out of the car and ran. Officers Macrenato and Reid followed appellant, who continued to speed, made several more turns, and ran two stop signs. Appellant also drove for some distance in the wrong direction and into oncoming traffic before running another red light and turning left. After several more blocks, appellant jumped out of his

3

car and ran. Officer Macrenato pursued appellant on foot, pulled out his gun, and ordered appellant to stop. Appellant did not comply. Eventually, Officers Reid and Macrenato subdued and arrested appellant, who was "kicking and kicking." Law enforcement officers found I.B.'s sweatshirt and phone in appellant's car.

*Verdict and Sentencing*

The jury convicted appellant of second degree robbery (§§ 211, 212.5, subd. (c) (Count 1)), evading a peace officer and causing serious bodily injury (Veh. Code, §§ 2800.1, 2800.3 (Count 2)), evading a peace officer and driving recklessly (Veh. Code, § 2800.2, subd. (a) (Count 3)), evading a peace officer and driving in the direction opposite to traffic (Veh. Code, § 2800.4 (Count 4)), gang participation (§ 186.22, subd. (a) (Count 5)), resisting an officer (§ 148, subd. (a)(1) (Count 6)) and leaving the scene of an injury accident (Veh. Code, § 20001, subd. (a) (Count 7)). With respect to Counts 1 through 4, the jury found true the enhancement that appellant personally inflicted great bodily injury (§§ 12022.7, subd. (a), 969f). With respect to Counts 1 and 2, the jury found true a gang enhancement (§ 186.22, subd. (b)(1)).

The court granted a new trial on the gang enhancement and struck the great bodily injury enhancement with respect to Count 2 (evading a police officer and causing serious bodily injury). The court found the prior prison allegation true and sentenced appellant to a total prison term of 18 years, 8 months calculated as follows: a three-year midterm for Count 1, plus a consecutive term of three years for the great bodily injury enhancement and a term of ten years for the gang enhancement; a consecutive term of eight months for reckless driving (Count 3); a consecutive term of one year for leaving the scene of an accident (Count 7); and a consecutive term of one year was imposed for the prison prior. The court imposed but stayed sentences on the remaining felony charges (Counts 2, 3, 4, and 5) and their associated enhancements pursuant to section 654, including the great bodily injury enhancement attached to Count 4.

The court also imposed a $41 theft fine pursuant to section 1202.5 and granted appellant 956 days of presentence, credit comprised of 831 days in custody and 125 conduct credits.

4

I.

*The Court Did Not Err by Denying Appellant's Batson/Wheeler Motion*

After filling out standard jury and gang questionnaires, the court and counsel voir dired prospective jurors. The juror who was the subject of appellant's *Batson/Wheeler* motion provided the following information and was questioned by the court and the prosecutor as follows:

In her standard and gang questionnaires, Ms. N. indicated she is single and has no children. She lives in Richmond and works for the Social Security Administration in Richmond. She did not date her gang questionnaire. She checked or answered "no" to every box on the questionnaires, and she wrote no narrative responses to any of the questions. When questioned by the court, Ms. N. provided one-word answers. The prosecutor questioned Ms. N. because she responded "no" to the question asking whether she had seen, read, or heard news coverage of cases involving gang activity. In response, Ms. N. admitted she had "heard" about gangs but did not "pay much attention to it." She denied witnessing gang violence or being a crime victim. She stated she could be fair and impartial.

After the prosecutor used peremptory challenges to excuse three African-American jurors, including Ms. N., defense counsel made a *Batson/Wheeler* motion, arguing: "I do not believe that there was any — any proper reason to dismiss Ms. N[.] She said very unequivocally that she could be fair and impartial, had no knowledge about gangs, no gang concerns. There was nothing indicating that she would be anything but fair and impartial. [¶] And I don't believe that . . . [the prosecutor] followed up to try to pursue any valid reasons as to why she could not be fair and impartial in this case. [¶] Ms. N[.] is an African-American juror, I presume. . . . I don't believe there was anything elicited as to Ms. N[.] as to any reason why she could not be fair and impartial."

When court asked the prosecutor to "respond to the prima facie issue," she stated, "I don't believe there's been prima facie case. . . . [¶] I hear [defense counsel']s argument that [Ms. N.] didn't say anything wrong that would justify it, but the problem is and the

5

reason why I had no comfort level with her, is she didn't say anything at all. She sticks out like a blinking red flag because her entire standard questionnaire is marked no, and her entire gang questionnaire is marked no on everything. She doesn't have any feelings about gangs. And then she denied ever hearing any gang coverage news at all, which I think is implausible, so that's the one question I asked her. And then she admitted that she had heard some. But she just didn't seem responsive and forthcoming."

The prosecutor explained she "look[ed] for . . . jurors with a stake in the community, an interest in the community, an interest in having crime off the street. [¶] And specifically I prefer married jurors with children. [Ms. N is] single and has no children. And just her demeanor seems like — she works for Social Security, so my thought process is she's probably getting paid to be here and would like to be on the jury, and isn't giving us anything at all to work with. She didn't date her questionnaire and just simply circled no to every single thing, which I found suspicious. [¶] Now, if I had already used nine challenges and Ms. N[.] was on the panel, then, okay, but the rest of the jurors in the box look pretty good to me right now, so I had the luxury of having a challenge available for a juror that was outside my comfort level."

In response, defense counsel argued: "Well, nonverbal cues, which it seems like [the prosecutor] is alluding to, ha[ve] specifically been held to be . . . an insufficient . . . basis to kick off a juror. . . . [¶] And there were also other jurors where they also answered no on every questionnaire and they have not been kicked off. So I don't — I don't believe that that is a valid basis to kick Ms. N[.] off." The prosecutor disagreed, stating, "I don't think there's anybody else who did a straight no, with no feelings about gang and no input as to anything in all 85 — or the portion of the 85 who did the questionnaires."

The court denied the *Batson/Wheeler* motion. It explained, "I do think that [defense counsel] has made a prima facie case, at least. There were only three African-American jurors in the first 21. . . . They are a cognizable group. And exercising three out of four challenges to date as to African-American Americans, I think, does raise a prima facie case. [¶] So that then puts the issue of whether there is justification for the

challenges. And the — although I do have some concerns about — about this, I think that [the prosecutor] has expressed legitimate bases in the record for the exercise of this challenge.”

The court continued, “[m]y own note[ ] on Ms. N[.] is that she’s not forthcoming. I wrote that down at the time. And her affect, I think — I had the same sense from [the prosecutor] that her affect was of disengagement. So I understand what [the prosecutor] is talking about and, you know, at the time I wrote ‘not forthcoming.’ . . . [¶] So although I understand [defense counsel’s] concern, and just simply based on numbers, I think that there’s a basis for that concern and, therefore, a prima facie case being made, I think [the prosecutor’s] explanations for the reasons that she challenged Ms. N[.] are in good-faith based on the record for nonracial — based on nonracial criteria. And so for that reason I’m going to deny the *Wheeler/Batson* motion.”

Under *Batson* and *Wheeler* “a party who believes his opponent is using peremptory challenges animated by a prohibited discriminatory purpose must first make a prima facie showing of such group bias. [Citations.] ‘In order to make a prima facie showing, “a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.”’ [Citation.] The objecting party must then produce evidence ‘“sufficient to permit the trial judge to draw an inference that discrimination has occurred.”’ [Citation.] This prima facie assessment is sometimes called ‘the first stage of a *Batson* inquiry.’ [Citation.]” (*People v. Jones* (2013) 57 Cal.4th 899, 916-917 (*Jones*).)

“If the defendant succeeds in establishing a prima facie case, the burden shifts to the prosecutor to justify the challenges. [Citation.] The court then evaluates the prosecutor’s responses to determine whether purposeful discrimination has been proven. At this so-called third stage of the *Batson* inquiry, the trial court often bases its decision on whether it finds the prosecutor’s race-neutral explanations for exercising a peremptory challenge are credible. ‘“Credibility can be measured by, among other factors, the prosecutor’s demeanor; by how reasonable, or how improbable, the explanations are; and

7

by whether the proffered rationale has some basis in accepted trial strategy.'" [Citations.]" (*Jones, supra,* 57 Cal.4th at p. 917.)

"'Review of a trial court's denial of a *Wheeler/ Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.' [Citation.] We have explained that '"the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor,"' that '"these determinations of credibility and demeanor lie '"peculiarly within a trial judge's province,"'"' and that, thus, '""in the absence of exceptional circumstances, we would defer to [the trial court].'""' [Citations.]" (*Jones, supra,* 57 Cal.4th at p. 917.)

Here, appellant contends "the prosecutor's asserted reasons for striking Ms. N. do not withstand scrutiny. Nor, for that matter, does the court's finding." We disagree.[3] As our high court has explained, "'[t]he proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' [Citation.] '"[E]ven a 'trivial' reason, if genuine and neutral, will suffice." [Citation.]" (*Jones, supra,* 57 Cal.4th at p. 917.)

Here, the prosecutor offered several reasons why she excused Ms. N.: (1) she stuck "out like a blinking red flag" because she did not date one of her questionnaires and "marked no" on her "entire standard questionnaire" and her "entire gang questionnaire[;]" (2) her denial of having heard gang news coverage on her questionnaire seemed implausible and she was not responsive and forthcoming when questioned about

---

[3]     Because the prosecutor identified nondiscriminatory reasons for exercising her peremptory challenge as to Ms. N., it is unnecessary to determine whether appellant established a prima facie showing of a discriminatory purpose. (*People v. Riccardi* (2012) 54 Cal.4th 758, 786.) "'Accordingly, we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing [the] African-American prospective juror[ ].' [Citations.]" (*Id.* at p. 787.)

it on voir dire; and (3) her single and childless status suggested she did not have a "stake in the community" or an "interest in having crime off the street."

Numerous cases have held these reasons are legitimate race-neutral reasons for exercising peremptory challenges. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 61 [juror's lack of interest in a case proper basis for exercising peremptory challenge]; *Jones, supra,* 57 Cal.4th at p. 917 ["[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons"]; *People v. Booker* (2011) 51 Cal.4th 141, 166 [court properly denied defendant's motion "with respect to J.M. because of his less than forthcoming responses on the juror questionnaire and during voir dire"]; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328 [marital status and lack of life experience].) The prosecutor's reasons for excusing Ms. N. "were neither inherently implausible nor affirmatively contradicted by anything in the record." (*People v. Reynoso* (2003) 31 Cal.4th 903, 926.)

We are not persuaded by appellant's reliance on *People v. Long* (2010) 189 Cal.App.4th 826 (*Long*). In *Long*, the reporter's transcript revealed one of the prosecutor's reasons for using a peremptory challenge was "demonstrably false" and that the prosecutor excused a prospective juror based on "his 'body language'" without providing specific examples. (*Id.* at pp. 843, 847.) Here and in contrast to *Long*, both the court and the prosecutor believed Ms. N. was reticent when answering questions. Unlike *Long*, there is no indication any of the prosecutor's reasons for excusing Ms. N. were "demonstrably false." Finally, the prosecutor here gave specific examples of Ms. N.'s reluctance to answer questions. "[N]othing in *Wheeler* disallows reliance on the prospective jurors' . . . manner of answering questions as a basis for rebutting a prima facie case. . . ." (*People v. Fuentes* (1991) 54 Cal.3d 707, 715.)

Appellant contends a comparative analysis demonstrates the prosecutor acted with discriminatory intent. "[C]omparative juror analysis must be considered for the first time on appeal while reviewing third stage *Batson/Wheeler* claims when a defendant relies on such evidence and the record is adequate to permit the comparisons. [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 662.) Our high court has, however, "warned of the

inherent limitations of such evidence. 'On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.' [Citation.] 'A transcript will show that the panelists gave similar answers: it cannot convey the different ways in which those answers were given. Yet those differences may legitimately impact the prosecutor's decision to strike or retain the prospective juror.' [Citation.]" (*Id.* at p. 662.)

Appellant contends the prosecutor excused Ms. N. because she is "single with no children" but was "not consistent in striking jurors based on either marital status, or parenthood." According to appellant, the prosecutor stated she "preferred" married jurors with children but "kept" several other jurors on the jury — Juror Nos. 1 and 3 — who did not meet that criteria.[4] Appellant's use of comparative juror analysis does not persuade us the court erred in denying his *Batson/Wheeler* motion. "While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so." (*People v. Lenix* (2008) 44 Cal.4th 602, 631, fn. omitted.)

Juror No. 1 was single with no children, but she had previously served on a jury in a criminal case that reached a verdict, had family members and friends who worked in law enforcement, and had been a victim of a gang crime. In addition, Juror No. 1 was engaged, responsive, and forthcoming during voir dire. Juror No. 3 was similarly single and childless but provided narrative responses on the jury questionnaire, had "seen neighborhoods ruined by gang activity[,]" and was "fearful" when living near public housing and witnessing gang activity. In contrast to Ms. N., Juror Nos. 1 and 3 were

---

[4]     Appellant also notes the prosecutor allowed Juror No. 5, who was single with a child, and Juror Nos. 6 and 7, who were married but childless, to remain on the jury. These jurors are different from Ms. N. and, in any event, they provided narrative responses to the jury questionnaire and were forthcoming during voir dire.

10

forthcoming and gave answers during voir dire indicating they held a favorable view of law enforcement and had a stake in the community.

Next, appellant argues the prosecutor's claim that she struck Ms. N. "because she works for the Social Security Administration and was 'probably getting paid to be here and would like to be on the jury'" was pretextual because Juror No. 2 also worked for the Social Security Administration. Appellant misconstrues the prosecutor's remarks. The prosecutor did not challenge Ms. N. because of where she worked; she challenged Ms. N. because she believed Ms. N. was not an ideal juror based on her demeanor, her lack of engagement during voir dire, and the prosecutor's belief that Ms. N lacked a stake in the community. Moreover, and in contrast with Ms. N., Juror No. 2 wrote narrative answers on the jury questionnaire, was talkative during voir dire, had prior jury experience, was married with children, and had family in law enforcement.

We conclude appellant's comparative analysis claim fails. Substantial evidence supports the denial of appellant's *Batson/Wheeler* motion.

II.

*Appellant's Challenge to the Sufficiency of the Evidence Supporting the
Section 186.22 Gang Enhancement Fails*

As noted above, the jury determined appellant committed second degree robbery (§§ 211, 212.5, subd. (c) (Count 1)) for the benefit of, at the direction of, or in association with the gang (§ 186.22, subd. (b)( 1)). Appellant challenges the sufficiency of the evidence to support the enhancement.

A.     Gang Evidence

Richmond Police Detective Daniel Reina testified as an expert on Richmond criminal street gangs. Reina described the history, culture, and violent character of the Sureño gang, which has several subsets in Richmond. Sureños are spread throughout Richmond, and a majority of the city is Sureño territory. Most homicides and narcotics offenses in Richmond are gang related. The Sureños' "primary activities . . . include homicides, assaults, robberies, stolen vehicles, . . . vandalisms [and] . . . weapons offenses[.]"

11

The Sureño gang is highly structured, and its core values are pride and respect. Many Sureño gang subsets incorporate the term "loco" — meaning "crazy" — to show their members will do anything. To become a Sureño, a new member is typically "jumped in," undergoing a physical assault to prove loyalty, willingness to take a beating for the gang, and to show he will stand his ground if attacked. A Sureño must remain active in the gang and commit crimes: committing crimes allows members to remain in good standing, to gain respect, and to enhance their reputation within the gang. It is very important for a Sureño to appear tough to other Sureños and to rival gang members because it permits the gang to retain control over its territory and to instill fear in the community. Sureños typically wear blue and black clothing and get tattoos to show they are associated with the gang. They associate with the letter M, and the numbers 13 and 3. Sureños use graffiti to mark the gang's territory, advertise the gang, and to intimidate and instill fear in the community. Gang members tend to carry guns and to be uncooperative with the police to show they are not afraid.

The prosecution introduced evidence of three crimes committed by appellant and Chavez as members of the Sureño gang. In an October 2007 incident, appellant and another Sureño, Aguilar, threatened the victim, smashed his car window, and Aguilar shot the victim's car tire. Appellant "terrorized the victim." Gang signs "played a significant role" in the terrorization and "were being thrown at the time of the incident."[5] Appellant was convicted of assault, criminal threats, and being a felon in possession of a firearm. In November 2007, appellant was convicted of vehicle theft after a police officer saw him "driving a stolen vehicle" and arrested him. In the third offense, in October 2009, Chavez was convicted of various crimes, including auto theft, possession of stolen property, and possession of a deadly weapon.

Reina opined Chavez is a Sureño because he associates with other Sureños, has common Sureño tattoos, and because he admitted "to being a Sureño while being housed in jail." Reina also opined appellant was a Sureño at the time of the October and

---

[5] Appellant was not present when Aguilar shot the car tire. The police report did not indicate the incident was gang related.

12

November 2007 offenses.  Shortly before the May 2010 robbery of I.B., appellant told Reina he was a member of the Sureño gang.  After his arrest, appellant told jail personnel "[a]t least half a dozen" times that he is a Sureño.  Appellant has Sureño tattoos on his hand and elbow.

The prosecutor posed a hypothetical where two Sureño gang members commit a street robbery where "two Sureños together approach a person in the street and ask to use the cell phone, and this person initially agrees, but then when he asks for his cell phone back, one Sureño says, No, brandishes a gun, and then says, This is a robbery, give me what you've got, maybe not verbatim, but communicates it's a robbery, at which point the victim runs.  And the other Sureño, without the gun, chases down that victim and pulls his sweatshirt off and then leaves with the sweatshirt and the cell phone."  Based on this hypothetical, Reina opined the crimes were "definitely done" for the benefit of, or in association with, the Sureño gang, even if the victim did not know the men were gang members and even if the item stolen was of little value.  Reina explained, "you have two Sureños . . . committing a robbery. [¶] Second, it benefits the gang in the fact that whether this person is just a normal citizen in the community, the fear and intimidation factor is there.  He is asked to borrow a cell phone.  Then when the citizen asks for his cell phone back, he's denied it. . . . That right there is kind of an intimidation factor.  Even more so when a firearm is presented[.]"

As Reina explained, committing a street robbery and evading the police elevates a gang member's status in the eyes of the gang.  On cross-examination, Reina agreed it would bolster his opinion that the offenses were committed for the gang's benefit if appellant or Chavez had worn gang colors, used gang slogans, or flashed gang signs, if the gang had taken credit for the crimes, or if the victim was rival gang member.  Reina concluded, however, that the lack of these additional factors did not change his opinion that the robbery was committed for the benefit of, or in association with, the Sureño street gang.

13

B.     Substantial Evidence Supports the Gang Enhancement

Appellant challenges only the first element of the enhancement: that the robbery was committed "for the benefit of, at the direction of, or in association with any criminal street gang . . . ." (§ 186.22, subd. (b)(1); *People v. Albillar* (2010) 51 Cal.4th 47, 61, 63-64 (*Albillar*).)

"In considering a challenge to the sufficiency of the evidence to  support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar, supra,* 51 Cal.4th at pp. 59-60 [sufficient evidence supported finding that crimes were "gang related in two ways: they were committed in association with the gang, and they were committed for the benefit of the gang"].)

Appellant is correct that "[n]ot every crime committed by gang members is related to a gang." (*Albillar, supra,* 51 Cal.4th at p. 60.)  Here, however, there is substantial evidence the robbery was committed "for the benefit of" the Sureño gang.  (§ 186.22, subd. (b)(1).)  *Albillar* is instructive.  There, the prosecution expert testified "that '[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit.  They're putting notches in their reputation.  When these members are doing that, the overall entity benefits and strengthens as a result of it.'  Reports of such conduct 'rais[e] the[ ] level of fear and intimidation in the community.'  [The expert] then applied his analysis to a hypothetical based on the facts of the crime . . . where the victim knew that at least two of her assailants were members of Southside Chiques.  'More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [Southside]

14

Chiques conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth. That is elevating [Southside] Chiques' reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.'" (*Albillar, supra,* 51 Cal.4th at p. 63.)

The California Supreme Court held "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1)" and that the expert's testimony supported "a finding that the crimes were committed to benefit the . . . gang." (*Albillar, supra,* 51 Cal.4th at p. 63.) Here as in *Albillar*, the prosecution expert, Detective Reina, testified Sureños commit crimes so they will be feared and respected by rival gangs and by the community. Reina also testified Sureños commit violent crimes to instill fear in the community and make community members reluctant to report the crimes or identify gang members. Reina further testified the robbery benefitted with the gang by instilling fear in the community and benefitted appellant by enhancing his reputation in the gang.

Appellant relies on several cases, including *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), and *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*) to support his argument that there was insufficient evidence to prove he "committed the crime for the benefit of the gang." According to appellant, there was insufficient evidence the robbery was gang related because he and Chavez did not wear gang-related clothing, did not make gang signs, and because the gang did not take credit for the robbery. These cases do not assist appellant. *Albarran* did not concern the sufficiency of the evidence supporting the gang enhancement and *Ramon* and *Ochoa* are inapposite. In those cases, the defendant either acted alone, or there was a lack of expert testimony the specific crime charged would benefit the gang. (*Ochoa, supra,* 179 Cal.App.4th at p. 663 [gang enhancement "cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes"]; *Ramon, supra,* 175 Cal.App.4th at p. 850 [no

evidence crime would benefit the gang].)[6] Here and in contrast to *Albarran*, *Ramon*, and *Ochoa*, there is evidence appellant and Chavez were gang members working in concert, and an expert witness testified about how the robbery benefitted the Sureños.

That appellant and Chavez did not wear gang clothing does not alter our conclusion. Reina testified it was more common for younger gang members to wear gang colors whereas for "the older" gang members "it's not as significant." Additionally, while I.B. did not notice appellant and Chavez's tattoos, there was evidence each had gang tattoos in visible places, on their hands. And while there was no evidence appellant or Chavez threw gang signs or bragged about the robbery, Reina testified the commission of violent crime in gang territory benefited the gang, as evidenced in the level of comfort with which the two men robbed I.B. at gunpoint in broad daylight.

In addition, there was substantial evidence the offenses were committed "in association" with a gang. (§ 186.22, subd. (b)(1).) *Albillar* is on point. There, our high court determined there was substantial evidence the "defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Albillar, supra,* 51 Cal.4th at p. 62.) As the *Albillar* court explained, the "defendants' conduct exceeded that which was necessary to establish that the offenses were committed in concert. Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police." (*Id.* at pp. 61-62.)

As in *Albillar*, Chavez and appellant acted together. They approached I.B. and — when he did not comply with Chavez's demand for the phone — Chavez pointed a gun at

---

[6]     For similar reasons, appellant's reliance on *People v. Martinez* (2004) 116 Cal.App.4th 753, 758-762 is also misplaced. There, the court concluded insufficient evidence supported a gang registration requirement attached to the defendant's sentence (§ 186.30) because there was no evidence the defendant committed the crime for the benefit of his gang.

him and appellant chased him. When appellant and Chavez fled from the police, appellant slowed the car down so Chavez could escape. In addition, appellant and Chavez — both admitted Sureños — had previously committed crimes together. The evidence supports the jury's finding that appellant and Chavez "came together *as gang members*" to rob I.B. in association with the Sureño gang. (*Albillar, supra,* 51 Cal.4th at pp. 62-63.) We conclude substantial evidence supports the jury's true finding on the gang enhancement in Count 1.

## III.

*Appellant Personally Inflicted Great Bodily Injury "in the Commission" of Count 4 Within the Meaning of Section 12022.7, Subdivision (a)*

In Count 4, the jury convicted appellant of violating Vehicle Code section 2800.4, and found he personally inflicted great bodily injury while committing the offense pursuant to section 12022.7, subdivision (a). Vehicle Code section 2800.4 makes it a crime to evade a police officer and, while doing so, drive in the wrong direction on a highway. (Sen. Bill No. 1735 (2005-2006 Reg. Sess.) § 1.) It provides in relevant part, "Whenever a person willfully flees or attempts to elude a pursuing peace officer in violation of [Vehicle Code] [s]ection 2800.1, and the person operating the pursued vehicle willfully drives that vehicle on a highway in a direction opposite to that in which the traffic lawfully moves upon that highway," the person may be punished by imprisonment in county jail or prison.[7] (See 2 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Crimes Against Public Peace and Welfare, § 329, p. 1088.) Section 12022.7,

---

[7]    Vehicle Code section 2800.1 defines officer evasion as follows: "Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor punishable by imprisonment in a county jail for not more than one year if all of the following conditions exist: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer, . . . and that peace officer is wearing a distinctive uniform."

17

subdivision (a) provides a sentencing enhancement for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony."

Appellant contends the great bodily injury enhancement must be stricken because he inflicted the injury on pedestrian Broadway *before* he drove in the direction opposite to traffic in violation of Vehicle Code section 2800.4. According to appellant, the crime prohibited by Vehicle Code section 2800.4 does not begin until the defendant drives in the wrong direction. We are aware of no published cases interpreting section 12022.7 and Vehicle Code section 2800.4 in this context. Because section 12022.7 "is dependent upon and necessarily attached to its underlying felony" (*People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311) the question is whether appellant was engaged "in the commission of a felony or attempted felony" when he caused Broadway's injuries. (§ 12022.7, subd. (a).) The answer is yes.

First, we "examine the statutory language, giving it a plain and commonsense meaning." (*People v. Fandinola* (2013) 221 Cal.App.4th 1415, 1421.) Vehicle Code section 2800.4 provides that "[*w*]henever a person willfully flees or attempts to elude a pursuing peace officer in violation of [Vehicle Code] [s]ection 2800.1" and "drives that vehicle on a highway in a direction opposite to traffic" the person has committed a misdemeanor or felony. (Italics added.) Although Vehicle Code section 2800.4 requires driving in the direction opposite to traffic at some point during the flight, the wrong-way driving need not be co-extensive with the entire duration of the flight; in other words, the element of willfully driving in the wrong direction may occur any time during the act of willfully fleeing a pursuing peace officer. Appellant cannot avoid the enhancement by attempting to temporally segment his willful evasion into the crime of violating Vehicle Code sections 2800.1 and 2800.4. Here, appellant injured Broadway while fleeing from a pursuing officer and/or attempting to evade that officer; during that same evasion appellant later drove in the wrong direction. That appellant had not completed the crime prohibited by Vehicle Code section 2800.4 by driving in the direction opposite to traffic when he struck Broadway does not alter our conclusion. Section 12022.7 applies because

18

appellant was engaged in the commission of the felony when he inflicted the great bodily injury. (See *People v. Gomez* (2008) 43 Cal.4th 249, 254 ([in a continuing offense "no artificial parsing is required as to the precise moment or order in which the elements are satisfied"]; see also *People v. Mixon* (1990) 225 Cal.App.3d 1471, 1488 [section 12022.7 applied where victim sustained injuries after the burglary].)

Our conclusion finds support in cases broadly construing identical language in section 12022.3, subdivision (a), which imposes a sentencing enhancement for the use of a deadly weapon "in the commission" of specified sex crimes. (See *People v. Jones* (2001) 25 Cal.4th 98, 107-108 [use of a weapon after a series of sex crimes can be "found to have occurred 'in the commission of'" the crimes under section 12022.3, subd. (a)]; *People v. Masbruch* (1996) 13 Cal.4th 1001, 1006 [section 12022.3, subd. (a) enhancement upheld where the defendant displayed the handgun before the rape]; *People v. Castro* (1994) 27 Cal.App.4th 578, 586 [broadly construing phrase "'in the commission of'" in statutes providing enhancement for use of a weapon in the commission of a crime].) Appellant has not articulated a persuasive reason why we should interpret "in the commission of" in section 12022.7, subdivision (a) narrowly where numerous courts have given identical language in similar statutes an """"expansive, not a tailored meaning.""""" (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1222, quoting *People v. Frausto* (2009) 180 Cal.App.4th 890, 900 and distinguishing *People v. Valdez* (2010) 189 Cal.App.4th 82 (*Valdez*).)

Appellant relies on *Valdez,* which considered when a great bodily injury enhancement may attach to the crime of fleeing the scene of an injury accident in violation of Vehicle Code section 20001, subdivision (a). (*Valdez, supra,* 189 Cal.App.4th at p. 84.) The *Valdez* court determined the "criminal act" prohibited by Vehicle Code section 20001, subdivision (a) is defendant's flight from the scene of the accident and that the injuries sustained in the car accident preceding the defendant's flight "were not inflicted *in the commission of* a felony or attempted felony based upon defendant's subsequent flight." (*Valdez*, *supra*, 189 Cal.App.4th at p. 90.) As the *Valdez* court explained, "the purpose of section 20001, subdivision (a) is to punish "not the

19

'hitting' but the 'running.'"" [Citation.] The injuries were 'caused by acts which occurred prior to the criminal act, not as a result of the criminal act.' [Citation.] The fact that defendant *subsequently* fled does not retroactively alter the character of the accident from noncriminal to criminal." (*Id.* at p. 90, fn. omitted.) *Valdez* concerned a different Vehicle Code statute and we decline to apply its reasoning here. In *Valdez*, the enhancement could not be attached to the crime of fleeing the accident scene prohibited by Vehicle Code section 20001, because the injury occurred *before* the flight; here, and in contrast to *Valdez*, the injury occurred *during* the flight that is the subject of Vehicle Code section 2800.4.

We conclude the evidence establishes appellant inflicted great bodily injury "in the commission" of Count 4 within the meaning of section 12022.7, subdivision (a).

IV.

*The Judgment Must be Modified to Reduce the*
*Section 1202.5 Theft Fine*

Appellant claims the court erred by imposing a $41 theft fine pursuant to section 1202.5, subdivision (a), which requires the court to impose a $10 fine "in any case in which a defendant is convicted of" specified offenses, including robbery. "[T]here are seven assessments, surcharges, and penalties parasitic to an underlying fine." (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1374 (*Voit*).) One of these is a 40 percent penalty to finance Department of Justice forensic laboratories. (Gov. Code, § 76104.7.) When appellant committed the offense in May 2010, however, the amount of this penalty was 10 percent. As a result, he is subject to the 10 percent penalty in effect at the time of his offense, not the 40 percent penalty. (See Stats. 2006, ch. 69, § 18; *People v. Batman* (2008) 159 Cal.App.4th 587, 590.) Another is a 50 percent state courthouse surcharge (Gov. Code, § 70372, subd. (a)(1)). In Contra Costa County, however, this amount has been reduced to 30 percent. (Gov. Code, § 76000, subd. (e); *Voit, supra,* 200 Cal.App.4th at p. 1375.)

Appellant asks this court to modify the judgment to impose a $10 theft fine and penalty assessments on that fine of $26. The People concede and we accept their

20

concession.  We modify the judgment to impose a theft fine of $10 and penalty assessments on that fine in the amount of $26.

V.

*The Judgment Must be Modified to Accurately Reflect*
*Appellant's Presentence Credits*

When the court sentenced appellant, it gave him credit for 956 days of presentence credit, comprised of 831 custody credits and 125 conduct credits.  Appellant's final claim is he is entitled to one additional day of custody credit (833 days) and one less day of conduct credit (124 days) for a total of 957 days (§§ 2900.5, subd. (a),  2933.1, subd. (c), 667.5, subd. (c)).  The People concede the issue.  We accept the People's concession and order the judgment modified.

DISPOSITION

The judgment is modified to: (1) impose a theft fine of $10 (Pen. Code, § 1202.5, subd. (a)) and penalty assessments on that fine in the amount of $26; and (2) award appellant a total of 957 days of presentence credit.  The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

_____
Jones, P.J.

We concur:

_____
Needham, J.

_____
Bruiniers, J.

21

Superior Court of the County of Contra Costa, No. 51105162, Leslie Landau, Judge.

Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Juliet B. Haley, Deputy Attorney General, for Plaintiff and Respondent.